UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNIVERSAL COMMUNICATION SYSTEMS INC., a Nevada Corporation; MICHAEL I ZWEBNER, individually; and others similarly situated<br>    Plaintiffs,<br><br>    v.<br><br>LYCOS, INC. and TERRA LYCOS, INC., d/b/a THE LYCOS NETWORK,<br>  Defendants. | Civil Action<br>NO. 05-10435-REK<br>CONSOLIDATED WITH<br>NO. 05-11172-REK |

| | |
|---|---|
| UNIVERSALCOMMUNICATION SYSTEMS INC., a Nevada Corporation; MICHAEL I ZWEBNER, individually; and others similarly situated<br>    Plaintiffs,<br><br>  v.<br><br>LYCOS,INC, d/b/a THE LYCOS NETWORK and TERRA NETWORKS, S.A.,<br>JOHN DOE#1 aka "the worm06"<br>JOHN DOE #2 aka "no_insiders"<br>JOHN DOE #3 aka "the womi06A"<br>JOHN DOE#4aka"65175R"<br>JOHN DOE #5 aka "Henry Johnsonl23"&<br>JOHN DOE#6aka"quondol"<br>JOHN DOE#7aka"Tobias95"<br>JOHN DOE #8 aka"CrawleySmith"<br>  Defendants. | CONSOLIDATED PROCEEDINGS<br><br>Civil Action<br>NO. 05-11172-REK<br>LEAD CASE |

## TERRA NETWORKS, S.A.'S OPPOSITION TO PLAINTIFFS' MOTION TO AMEND THEIR COMPLAINT

Defendant TERRA NETWORKS, S.A. ("Terra"), a Spanish company, by and through its

undersigned counsel, hereby submits this Memorandum in Opposition to Plaintiffs' Motion for

Leave to Amend the Complaint Pursuant to Rule 15 ("Motion to Amend").[1]  This Court has already dismissed the Complaint against Defendant Terra which moved to dismiss for lack of personal jurisdiction and on grounds that the Complaint could not state a cause of action.  Once the Complaint was dismissed, the Plaintiff no longer had the ability to amend it.  Moreover, the proposed amendments should be dismissed on grounds of futility since it still fails to establish a basis for personal jurisdiction over Defendant Terra, and because the Amended Complaint seeks to assert claims that are barred by 47 U.S.C. § 230.

## ARGUMENT

### I.    A Plaintiff Cannot "Amend" A Complaint That Has Been Dismissed

Once a district court dismisses a complaint, the plaintiff can no longer amend the complaint.  See Berthoff v. United States, 308 F.3d 124, 129 (1st Cir 2002) (district court lacked power to grant petitioner's motion to amend petition after dismissal because petitioner had not sought post-judgment relief under Fed. R. Civ. P. 60(b) or any other rule); Hanley v. United States, 74 A.F.T.R.2d (RIA) 6780, 1994 U.S. App. LEXIS 30760 (1st Cir. 1994)[2] ("[O]nce a district court enters judgment on a dismissal, the filing of an amendment cannot be allowed until the judgment is set aside or vacated under Federal Rule of Civil Procedure 59(e) or 60(b).").[3]  Plaintiffs have not moved to set aside or vacate the Court's October 13, 2005 Order, which granted Terra's Motion to Dismiss the Plaintiffs' Complaint.  Having failed to timely move for post-judgment relief, the Plaintiffs cannot now move to amend their complaint.  See Acevedo-Villalobos v. Hernandez, 22

---

[1] Defendant Lycos Inc., *dba* The Lycos Network ("Lycos") is expected to file an opposition to the Plaintiffs' Motion to Amend.  To the extent Lycos' arguments are applicable to Terra's circumstances, Terra hereby incorporates Lycos' arguments and authority into this brief as if they were set forth in their entirety.  Terra also incorporates hereto, the arguments and authority set forth in the Memorandum of Law in Support of Defendant Terra Networks S.A.'s Motion to Dismiss the Complaints, dated August 16, 2005 (Terra's Motion to Dismiss").
[2] All unpublished cases are attached hereto as Exhibit A.
[3] To be timely, a motion to alter or amend judgment under Rule 59(e) must be filed within ten (10) days after the judgment is entered.  Fed. R. Civ. P 59(e).

F.3d 384, 389 (1st Cir. 1994) ("Unless postjudgment relief is granted, the district court lacks power

to grant a motion to amend the complaint under Rule 15(a)."). Rather, Plaintiffs' only remedy is

appeal. See id. ("In short, we hold that when a district court uses the words, 'The complaint is

dismissed,' without expressly granting the plaintiff leave to amend, this is a 'final decision' from

which a timely appeal may be taken.").


## II.    Motion to Amend Would Be Futile

In the event the Court were to entertain the Motion to Amend, the Court should deny the

Plaintiffs' Motion on futility grounds.  A court should deny a motion to amend where the

amendment would be a futile act. See Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed.

2d 222 (1962)) (Holding that district courts may deny a plaintiff's motion to amend its complaint

when it finds the amendment would be futile).  An amendment is futile if it fails to state a claim or

would be subject to a motion to dismiss.  See Jackson v. Salon, 614 F.2d 15 (1st Cir. 1980)

(affirming denial of leave to amend after grant of dismissal when amendment would be futile in

failing to establish jurisdiction); Freedom Wireless, Inc. v. Boston Communs. Group, Inc., 218 F.

Supp. 2d 19, 26 (D. Mass. 2002) ("[I]n light of this Court's lack of personal jurisdiction over

Rogers, any attempt by Freedom Wireless to amend its complaint to add an additional cause of

action against Rogers would be futile.  Thus, Freedom Wireless' motion for leave to amend its

complaint and for reconsideration of the Court's April 16, 2002 Order is denied.").  A proposed

amended complaint is futile which fails to cure the deficiencies in its previously dismissed

complaint. See Judge v. City of Lowell, 160 F.3d 67, 79 (1st Cir. 1998) ("Where an amendment

would be futile . . . the district court should not needlessly prolong matters.") (internal quotes

omitted).

Here, the proposed Amended Complaint would be futile because 1) Plaintiffs cannot

establish that this Court has personal jurisdiction over Terra; 2) Plaintiffs' claims against Terra in the Amended Complaint are barred under Section 230 of the Federal Communications Decency Act, 47 U.S.C. § 230, because Terra is not a "information content provider" as defined therein; and 3) the Amended Complaint fails to state a claim for liability against Terra.

A.     **Permitting Plaintiffs to Amended Their Complaint Would be Futile**

    i.     Plaintiffs Cannot Establish this Court has Personal Jurisdiction Over Terra.

The Plaintiffs bear the burden of proving the Court's personal jurisdiction over the Defendant. Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st Cir. 1995); Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 674-75 (1st Cir. 1992) (plaintiff must "prove facts necessary to sustain jurisdiction"; affirming jurisdictional dismissal). As stated more fully in Terra's Motion to Dismiss, to establish personal jurisdiction over Terra, the Plaintiffs must set forth facts, through the presentation of evidence, which establishes that Terra is subject to this Court's personal jurisdiction. It has long been the rule that plaintiffs may not rely on unsupported allegations in their pleadings to make a prima facie showing of personal jurisdiction. See Chlebda v. H.E. Fortna and Bro., Inc., 609 F.2d 1022, 1024 (1st Cir. 1979) (view that jurisdictional allegations must be taken as true is an "elementary mistake").

To establish that Terra is subject to personal jurisdiction in this district through its subsidiary Lycos, as the Amended Complaint inartfully appears to attempt, the Plaintiffs must present "strong and robust evidence of parental control over subsidiary that renders subsidiary mere shell." De Castro v. Sanifill, Inc., 198 F.3d 282, 284 (1st Cir. 1999). Except for bald and unsupported allegations, (some made "upon information and belief"), Plaintiffs' Amended Complaint presents absolutely no evidence that Terra exercised any parental control over Lycos, much less reaching the level of "strong and robust" evidence required by De Castro. Plaintiffs

have added nothing new to their Amended Complaint which would save it from the same fate

which befell its predecessor: dismissal.

Further, at this stage of the litigation, the Plaintiffs must overcome a heightened evidentiary

burden to justify amending to plead around the legal deficiencies this Court found in Plaintiffs'

Original Complaint:

> A motion to amend a complaint will be treated differently depending on its  timing
> and the context in which it is filed. . . Where the motion to amend is filed after the
> opposing party has timely moved for summary judgment, a plaintiff is required to
> show "substantial and convincing evidence" to justify a belated attempt to amend a
> complaint.

Steir v. Girl Scouts of the USA, 383 F.3d 7, 11-12 (1st Cir. 2004).  This heightened standard has

also been used when the defendant has moved for dismissal of the complaint for lack of

jurisdiction.  See Dwyer v. United States, 76 F. Supp. 2d 154, 159 (D.N.H. 1999).[4]  See also, In re

Computervision Corp. Sec. Litig., 914 F. Supp. 717, 719 (D. Mass. 1996) (suggesting heightened

evidentiary standard would apply where motion to amend followed motion to dismiss, but finding

plaintiff's motion to amend failed even under lower standard).  Because Terra has already moved

for, and been granted, dismissal of Plaintiffs' original claims, the Plaintiffs' Motion to Amend is

put forth "solely to avert imminent defeat."  Glassman v. Computervision Corp., 90 F.3d 617, 623

(1st Cir. 1996).  In such circumstances, the Plaintiffs must "show that these proposed amendments

[have] substantial merit and [are] supported by substantial and convincing evidence."  Torres-

Matos v. St. Lawrence Garment Co., 901 F.2d 1144, 1146 (1st Cir. 1990) (citing, Carey v. Beans,

---

[4] This heightened standard may also apply by analogy where "plaintiffs seek amendment solely to avert imminent
defeat." Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996). See also, Cowen v. Bank United, FSB,
70 F.3d 937, 944 (7th Cir. 1995) ("A plaintiff who proposes to amend his complaint after the defendant has moved for
summary judgment may be maneuvering desperately to stave off the immediate dismissal of the case. With this a
possibility, district judges are not content with an allegation sufficient in law; they want to see some evidence to back
it up.") (referring to, Cowen v. Bank United FSB, 1995 U.S. Dist. LEXIS 1087, 26-27 (D. Ill. 1995) ("[A]defendant
would be seriously prejudiced if the plaintiff had the unfettered right to alter his cause of action every time it appeared
that the defendant might be able to defeat it.").

500 F. Supp. 580, 582 (E.D. Pa. 1980)) ("[W]here plaintiff files a motion to amend after defendant has moved for summary judgment the motion to amend will not be granted unless the party seeking amendment can show not only that the proposed amendment has 'substantial merit' but also come forward with 'substantial and convincing evidence' supporting the newly asserted claim."); Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. 1994) ("As the Rule 15 motion in the present case was not filed until after RTC moved for summary judgment, Gold was required to demonstrate to the district court that the proposed amendments were supported by 'substantial and convincing evidence.'").  As in Resolution Trust Corp. v. Gold, the Plaintiffs have not established their claims have "substantial merit" and their proposed Amended Complaint is not supported by "substantial and convincing evidence" sufficient to overcome the Plaintiffs' heightened evidentiary burden.

Given the higher evidentiary burden the Amended Complaint must overcome at this stage of the litigation, and Plaintiffs' failure to satisfy even the lower standard, the Plaintiffs' Motion to Amend must fail.

     ii.     Plaintiffs' Amended Claims are Still Barred by 47 U.S.C. § 230.

Plaintiff's Motion to Amend claims that it "removed the . . . deficiency" of failing to allege in its Original Complaint that Terra is a "content provider."  Motion to Amend at p. 2.  However, a review of the Amended Complaint shows that Plaintiffs have not removed that deficiency, and have produced absolutely no evidence—much less "substantial and convincing" evidence—that Terra provided the content about which the Plaintiffs complain.  Instead, the Amended Complaint simply seeks to hold Terra responsible for the content appearing on its message board, which was wholly created by third-parties.  See Amended Complaint at p. 13.  This is exactly the type of liability Congress enacted 47 U.S.C. § 230 to bar.  See Terra's Motion to Dismiss at p. 16 and case citations at fn. 5; see also, Carafano v. Metrosplash.Com, Inc., 339 F.3d 1119 (9th Cir. 2003)

("Under § 230(c), therefore, so long as a third party willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process.").

Where a proposed amended complaint fails to state a claim under the asserted federal statute, leave to amend should be denied on futility grounds. See Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996) ("'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted. In reviewing for "futility," the district court applies the same standard of legal sufficiency as applies to a Rule 12(b)(6) motion.") (citations omitted).

As Plaintiffs cannot factually establish that Terra provided the "essential published content" of the messages at issue (Carafano at 1124) with "substantial and convincing" evidence (Resolution Trust Corp. at 253), the Amended Complaint would be futile and Plaintiffs' Motion to Amend should be denied.

iii.    The Amended Complaint Fails to State a Claim on Remaining Claims.

In their Amended Complaint, the Plaintiffs have failed to assert substantially new factual or legal allegations against Terra. Nor have the Plaintiffs provided "substantial and convincing" evidence to support what insignificant new allegations they do assert. Thus, with regard to the Plaintiffs' remaining allegations, Terra relies on the arguments and authority it asserted in its Motion to Dismiss.[5]

---

[5] Plaintiffs continue to assert that Terra has been concealing its whereabouts to avoid service of process. Amended Complaint at ¶14(e). Terra notes that it has consented to service of process in this action, and cannot be said to have been attempting to avoid service.

## CONCLUSION

For the reasons stated herein, Defendant Terra respectfully requests that the Court issue an Order denying the Plaintiffs motion seeking leave to amend their Complaint, and granting Terra such other and further relief as this Court deems just and proper.

TERRA NETWORKS, S.A.

Thomas G. Rohback (Pro Hac Vice)
James J. Reardon, Jr. (BBO#566161)
LeBoeuf, Lamb, Greene & MacRae, LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103
Tel:  (860)293-3596
Fax: (860)293-3555

Dated: October 28, 2005

**EXHIBIT A**

LEXSEE

**KENNETH A. HANLEY AND PHYLLIS G. HANLEY, Plaintiffs, Appellants, v.
UNITED STATES OF AMERICA, Defendant, Appellee.**

**No. 94-1315**

**UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT**

*1994 U.S. App. LEXIS 30760; 74 A.F.T.R.2d (RIA) 6780*

**October 5, 1994, Decided**

**NOTICE:** [*1]   RULES OF THE FIRST CIRCUIT
COURT OF APPEALS MAY LIMIT CITATION TO
UNPUBLISHED OPINIONS. PLEASE REFER TO
THE RULES OF THE UNITED STATES COURT OF
APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE DISTRICT OF
MASSACHUSETTS. Hon. Frank H. Freedman, Senior
U.S. District Judge

**DISPOSITION:** Affirmed.

**LexisNexis(R) Headnotes**

**COUNSEL:** Kenneth A. Hanley and Phyllis G. Hanley
on brief pro se.

Loretta C. Argrett, Assistant Attorney General, Gary R.
Allen, Charles E. Brookhart and Sara Ann Ketchum,
Attorneys, Tax Division, Department of Justice, on brief
for appellee.

**JUDGES:** Before Torruella, Chief Judge, Selya and Cyr,
Circuit Judges.

**OPINIONBY:** Per Curiam

**OPINION:**

    Per Curiam. Appellants Keith and Phyllis Manley
appeal pro se from a judgment dismissing their first
amended complaint for lack of jurisdiction and from the
denial of their post-judgment motions to amend the
complaint and for a new trial. For the following reasons,
we affirm.

        BACKGROUND

    This is the second appeal to this court in connection
with the Hanleys' 1986 income taxes. On April 26, 1990,
the Hanleys filed a petition in the United States Tax
Court for a redetermination of deficiency for tax year
1986. In *Hanley v. Commissioner, No. 92-1035, 1992
U.S. App. LEXIS 32738* (1st Cir. Dec. 16, [*2] 1992)
(per curiam), we upheld the Tax Court's finding of a
deficiency in the amount of $ 524. On April 9, 1993, the
Hanleys filed a vaguely worded complaint in the United
States District Court for the District of Massachusetts
alleging that the Internal Revenue Service had
discriminated against them and deprived them of due
process of law by violating various federal statutes in
connection with the assessment and collection of their
1986 taxes. Although the complaint is notably lacking in
factual detail, the central allegation is that the IRS failed
to process a partnership schedule attached to the Hanleys'
1986 tax return, and as a result, improperly assessed
them in the amount of $ 1,824. The complaint also
alleges that the IRS improperly failed to issue a notice of
deficiency before making this assessment. n1 Read
liberally, and in light of later filings, the complaint
alleges that the IRS unlawfully levied on Keith Manley's
military pension. n2 Finally, the complaint alleges that
the IRS made a mathematical error in computing the
Hanleys' tax liability for 1986 and refuses to correct it.
n3

        n1 Although there is no evidence in the
    record whether the IRS sent the Hanleys a notice
    of deficiency before assessing them $ 1,824 for
    tax year 1986, it is undisputed that the IRS at
    some point determined that an additional amount
    was due for that taxable year and sent the
    Hanleys a notice of deficiency in the amount of $
    1,217. Indeed, it was after receiving this notice of
    deficiency in January 1990 for $ 1,217 that the
    Hanleys filed a petition in the Tax Court.

1994 U.S. App. LEXIS 30760, *; 74 A.F.T.R.2d (RIA) 6780

[*3]

n2 Although the Hanleys contend that this pension is exempt from levy, they rely on chapter 73 of title 10 of the United States Code, which exempts annuities payable to a surviving spouse and children--but not military pensions--from levy. See *10 U.S.C. § 1440; 26 U.S.C. § 6334*(6). Although under *26 U.S.C. § 6334*(6), special pension payments received by a person whose name has been entered on the Army, Navy, Air Force, and Coast Guard Medal of Honor roll are exempt from levy, appellants have never alleged that Keith Manley has been entered on this honor roll or receives such a special pension.

n3 The original complaint names the Commissioner of Internal Revenue as defendant. The first amended complaint substitutes the United States as defendant.

On July 23, 1993, the government moved to dismiss the complaint for lack of jurisdiction. Among other things, the government argued that to the extent the suit could be construed as a claim for a refund pursuant to *28 U.S.C. § 1346* [*4] (a) and *26 U.S.C. § 7422*, it is barred by the Hanleys' failure to allege, as jurisdictional prerequisites, that they filed an administrative claim for refund and paid the full tax assessed. In addition, the government argued that such a suit is barred by *26 U.S.C. § 6512*(a), which prohibits a taxpayer who has petitioned the Tax Court from filing a refund suit for the same taxable year. The government also argued that to the extent the complaint could be read as alleging a common law tort, such a claim is barred by *28 U.S.C. § 2680*(c). Finally, the government argued that any claim under *26 U.S.C. § 7433* for damages caused by the IRS during the collection of taxes is barred by the Hanleys' failure to allege that they exhausted administrative remedies pursuant to *26 U.S.C. § 7433*(d)(1).

On November 23, 1993, the district court dismissed the first amended complaint for lack of jurisdiction. On December 7, 1993, the Hanleys filed a motion to amend the complaint. A proposed second amended complaint, attached [*5] to this motion, added the allegation that the Hanleys had exhausted administrative remedies, but was not otherwise significantly different than the first amended complaint. Approximately a week later, on December 13, 1993, the Hanleys filed a motion for new trial. Appended to this motion was a copy of a document headed:

ADMINISTRATIVE DEMAND TO THE SECRETARY (COMMISSIONER OF INTERNAL REVENUE SERVICE) FOR RETURN OF ALL ILL GOTTEN OR OVER COLLECTED MONEY TAKEN BY THE REVENUE SERVICE BY MEANS OF MISTAKE; OVER ASSESSMENT; LEVIES; AUTOMATED COLLECTION PROCESS OR OTHER MEANS NOT SPECIFICALLY LEGALLY AUTHORIZED TOO UNDER THE REVENUE LAWS AND TO RETURN ALL OVER ASSESSED PENALTIES; AND INTEREST NOT ENTITLED TO, AS PER THE IRS CODE . . .

The district court denied both post-judgment motions, and this appeal followed.

DISCUSSION

We begin with the basic proposition that the United States, as a sovereign, is immune from lawsuit unless it consents to be sued. *United States v. Testan, 424 U.S. 392, 399, 47 L. Ed. 2d 114, 96 S. Ct. 948 (1976).* Accordingly, any lawsuit against the United States must be brought in compliance with a specific statute which expressly waives sovereign immunity. [*6] *Id. at 399.* A plaintiff has the burden of showing a waiver of sovereign immunity. See *Baker v. United States, 817 F.2d 560, 562 (9th Cir. 1987),* cert. denied, *487 U.S. 1204 (1988).*

The Hanleys contend that *28 U.S.C. § 1346*(a)(1) and *26 U.S.C. § 7422*, which together authorize a taxpayer to sue the government for a tax refund, provide a jurisdictional base for their suit. They further argue that they not only alleged, but submitted evidence to prove, that they satisfied the requirements for such a suit by filing an administrative claim and paying all taxes due. See *McMillen v. United States Dep't of Treasury, 960 F.2d 187, 188 (1st Cir. 1991)* (per curiam) (ruling that district court lacked jurisdiction over refund action where these requirements were not met). Appellants also contend that the district court had jurisdiction under *26 U.S.C. § 7433*, and that they alleged and proved that they exhausted the administrative remedies necessary to bring [*7] an action under this statute for damages incurred during the collection of taxes. See *Conforte v. United States, 979 F.2d 1375, 1377 (9th Cir. 1992)* (ruling that district court lacked jurisdiction over § 7433 action where plaintiff failed to exhaust administrative remedies).

There is no question that the first amended complaint fails to allege that the Hanleys exhausted the administrative remedies necessary to bring a refund suit or a § 7433 action. In their opposition to the motion to dismiss, however, the Hanleys allege that "all administrative avenues were exhausted." The proposed second amended complaint alleges that the Hanleys filed for an administrative refund and "exhausted all legal and administrative avenues." In the accompanying motion to amend, the Hanleys cite as proof that they made an administrative claim, the document, attached to the motion for new trial, demanding "return of all ill gotten or over collected money." In their motion for a new trial, appellants cite this same document as proof that they exhausted the administrative requirements for filing a § 7433 claim.

Even if we indulge appellants as pro se litigants and construe [*8] their first amended complaint to incorporate later allegations of having exhausted administrative remedies, we are persuaded that the refund and § 7433 claims were properly dismissed. The applicable Treasury regulations require that an administrative refund claim include a detailed statement providing the grounds for relief. See 26 C.F.R. § 301.6402-2(b)(1). If this requirement is not met, meaningful review of the refund claim at the administrative level is impossible, and a district court lacks jurisdiction to entertain the refund suit. See, e.g., Hefti v. IRS, 8 F.3d 1169, 1173 (7th Cir. 1993); Goulding v. United States, 929 F.2d 329, 332 (7th Cir. 1991), cert. denied, 121 L. Ed. 2d 132, 113 S. Ct. 188 (1992). In the instant case, the document alleged to be the Hanleys' administrative refund claim utterly fails to specify any grounds for relief, and district court jurisdiction was, accordingly, lacking. n4 The Treasury regulations for filing an administrative claim pursuant to § 7433 similarly require a statement of the grounds for relief. See 26 C.F.R. § 301.7433-1(e)(2). We think it equally [*9] apparent that the purported administrative demand for "return of all ill gotten or over collected money" was inadequate to confer district court jurisdiction over the Hanleys' § 7433 claim.

n4 In light of our ruling that appellants failed to satisfy the jurisdictional prerequisites for a refund suit, we need not reach the government's argument that the filing of a petition in the Tax Court serves as a jurisdictional bar to any refund suit. We observe, however, that as a general rule, the Tax Court's jurisdiction extends to the entire subject of the correct tax for the particular year, and 26 U.S.C. § 6512(a) serves to deprive the district court of jurisdiction once the Tax Court has been petitioned. See Solitron Devices v.

United States, 862 F.2d 846, 848 (11th Cir. 1989). Appellants have not argued that the instant case falls within any of the exceptions set forth in § 6512(a).

For similar reasons, we uphold the denial of appellants' motion to [*10] amend the complaint. We note as an initial matter that once a district court enters judgment on a dismissal, the filing of an amendment cannot be allowed until the judgment is set aside or vacated under Federal Rule of Civil Procedure 59(e) or 60(b). See Acevedo-Villalobos v. Hernandez, 22 F.3d 384, 389 (1st Cir. 1994), petition for cert. filed, 63 U.S.L.W. 3161 (U.S. Aug. 29, 1994) (No. 94-362). Putting aside the fact that the Hanleys did not accompany their motion to amend with the requisite Rule 59(e) or 60(b) motion, we could not find that the district court abused its discretion. The only significant change in the proposed second amended complaint was the addition of allegations that the Hanleys exhausted administrative avenues. Assuming, without deciding, that the proposed changes cured certain facial deficiencies in the first amended complaint with respect to the Hanleys' refund and § 7433 claims, it is plain, for the reasons just discussed, that the proposed amendments were futile. See Jackson v. Salon, 614 F.2d 15, 17 (1st Cir. 1980) (post-judgment motion to amend complaint [*11] properly denied where amendment would be futile).

We need not devote as much attention to appellants' remaining arguments. The Hanleys contend that the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671-2680, provides a jurisdictional basis for their action. Section 2680(c) of the FTCA, however, prohibits any suit against the United States "arising in respect of the assessment or collection of any tax . . ." See McMillen, 960 F.2d at 188. The conduct alleged by the Hanleys as the basis of their lawsuit falls squarely within the parameters of this exclusion. Contrary to the position taken by the Hanleys, § 2680(c) encompasses any activities of an IRS agent even remotely related to his or her official duties of assessing or collecting taxes, including unlawful or unauthorized actions. See, e.g., National Commodity & Barter Ass'n v. Gibbs, 886 F.2d 1240, 1246 n.5 (10th Cir. 1989) (rejecting argument that § 2680(c) is inapplicable where IRS failed to comply with its own procedures); Capozzoli v. Tracey, 663 F.2d 654, 657 (5th Cir. Dec. 1981) (rejecting [*12] argument that tortious or wrongful conduct by an agent cannot, by definition, be in respect of his official duties of assessing or collecting taxes); Morris v. United States, 521 F.2d 872, 874 (9th Cir. 1975) (unlawful seizure and levy of property fell within exempted group of tort claims arising out of tax collection efforts). Appellants' constitutional challenge to § 2680(c) is meritless.

1994 U.S. App. LEXIS 30760, *; 74 A.F.T.R.2d (RIA) 6780

We also reject appellants' argument that the district court's dismissal of their first amended complaint deprived them of their right to a jury trial under the Constitution and various federal statutes. Where, as here, federal law provides no basis for the exercise of federal jurisdiction, there is no cognizable cause of action to which any constitutional or statutory right to a jury trial can apply. See *County of Suffolk v. Long Island Lighting Co., 710 F. Supp. 1387, 1404 (E.D.N.Y. 1989),* aff'd in part and rev'd in part, *907 F.2d 1295 (2d Cir. 1990)* (ruling that Seventh Amendment right to a jury trial was not implicated where plaintiff's claim as dismissed for lack of jurisdiction). We add, however, [*13] that the Seventh Amendment right to a jury trial does not extend to actions against the United States, see, e.g., *Hudson v.*

*United States, 766 F.2d 1288, 1292 (9th Cir. 1985);* and that Article III, Section 2, Clause 3 of the Constitution, which provides that "the trial of all crimes . . . shall be by jury", is not applicable to the instant civil action alleging violations of civil statutes.

We have considered appellants' remaining arguments and find them to be without merit. n5

n5 We also deny appellants' request for oral argument.

Affirmed.

LEXSEE

**LINWOOD COWEN and JEAN COWEN, on behalf of themselves and all others similarly situated, Plaintiffs, v. BANK UNITED OF TEXAS FSB, d/b/a COMMONWEALTH UNITED MORTGAGE, Defendants.**

**CASE NO. 94 C 3838**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*1995 U.S. Dist. LEXIS 1087*

**January 25, 1995, Decided**
**January 25, 1995, FILED; January 30, 1995, DOCKETED**

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For LINWOOD COWEN, JEAN COWEN, on behalf of themselves and all others similarly situated, plaintiffs: Daniel A. Edelman, Cathleen M. Combs, James Eric Vander Arend, Michelle Ann Weinberg, O. Randolph Bragg, Tara Goodwin Redmond, E delman & C ombs, C hicago, I L. Charles M Baird, Law Offices of Charles M. Baird, Miami Beach, FL.

For BANK UNITED OF TEXAS FSB dba Commonwealth United Mortgage, defendant: D aniel A . Cummings, Elizabeth Porter Staggs, Rothschild, Barry & Myers, P.C., Chicago, IL.

**JUDGES:** Harry D. Leinenweber, Judge, United States District Court

**OPINIONBY:** Harry D. Leinenweber

**OPINION:**

### MEMORANDUM OPINION AND ORDER

BACKGROUND

The fundamental question in this case is whether a $ 14.00 "courier fee" charged to plaintiffs by an independent title company in connection with the refinancing of their home with defendant is a "finance charge" under Regulation Z of the Truth in Lending Act. For the reasons discussed below, the court finds that it is not, and grants defendant's motion for summary judgment. The court also denies plaintiffs' motion for leave to amend their complaint.

Plaintiffs, Jean and Linwood Cowen (the "Cowens"), are residents of Massachusetts. Defendant Bank United of Texas FSB ("Bank United") is a Texas corporation with offices in Illinois. In January 1994, the Cowens applied for a residential mortgage loan from Bank United in order to refinance the two existing mortgages on their home. This loan was eventually approved by Bank United, and the loan transaction closed on March 14, 1994.

The Cowens applied for the Bank United loan through Regional Mortgage Programs, Inc. ("Regional"), a Rhode Island mortgage broker. As part of the application process, Regional sent the Cowens [*2] a document entitled: "Title Request/Title Insurance Preference." This document explained that Regional required title insurance on the Cowens' home, and that the Cowens had the right to choose their own attorney or title company to perform the title examination. Regional, however, recommended to the Cowens that they waive this right and let Regional choose a title attorney unless they felt strongly about using their own lawyer.

The Cowens followed Regional's advice, and signed a statement g iving Regional the right to assign the title work to the attorney of its choice. Regional selected Equity Title and C losing S ervices, Inc. ("Equity Title") to perform the title search and also to handle the closing. Richard Abilheira ("Abilheira"), an Equity Title attorney, was the individual who actually performed these functions.

At the closing, the Cowens were given a Truth in Lending Act Disclosure Statement (the "TILA Disclosure"), prepared b y B ank U nited. As r equired b y law, the TILA Disclosure indicated, among other things, the loan's annual percentage rate, the amount financed, the finance charge, and the total amount of all payments.

1995 U.S. Dist. LEXIS 1087, *

*15 U.S.C. § 1604* [*3] (1988); 12 C.F.R. § 226.18 (1994). The Cowens were also given a copy of their HUD-1 Settlement Statement (the "HUD-1"), which was prepared by Equity Title. The HUD-1 provides an accounting of all funds received and paid by the borrower at the closing. Line 1204 of the Cowens' HUD-1 listed a $ 10.00 charge for "Assignment fee/BUOT," and line 1304 noted a $ 14.00 charge for "Courier fee/ETC 2 $ 7.00." It is these two charges, hereinafter referred to as the "assignment fee" and the "courier fee," that are at the heart of this action.

In their three-count amended complaint, the Cowens essentially claim that Bank United wrongfully included the assignment fee and the courier fee in the "amount financed" section of the TILA Disclosure, rather than categorizing these fees as "finance charges." Count I alleges a violation of the TILA, *15 U.S.C. § 1601 et seq.* as implemented by Regulation Z, 12 C.F.R. § 226. Count II alleges that this conduct also violated over fifty various state statutes prohibiting unfair and deceptive trade practices. n1 Count III is a claim for restitution. Plaintiffs seek recovery of their actual damages, statutory damages, costs, [*4] and attorneys' fees.

> n1 The Cowens brought this suit as a purported nationwide class action, but defendant elected to proceed with its motion for summary judgment before the court considered the question of class certification. *See generally Wright v. Schock, 742 F.2d 541 (9th Cir. 1984).*

After some preliminary written discovery, Bank United moved for summary judgment on October 7, 1994. Then, on December 12, 1994, eleven days before their response to the motion for summary judgment was due, the Cowens moved for leave to amend their complaint a second time to add new allegations of wrongdoing by Bank United in connection with two other fees disclosed in the HUD-1: a $ 50.00 "title rundown and record" fee, and a $ 395.00 "settlement or closing fee." The Cowens now claim that the title rundown and record fee, like the assignment and courier fees, should have been labeled as a finance charge instead of being included in the amount financed. Plaintiffs also contend that the settlement [*5] or closing fee includes duplicative charges which should have been disclosed as finance charges under the TILA as well. The court will address each of the parties' motions in turn.

DISCUSSION

I. Bank United's Motion for Summary Judgment

A. Truth in Lending Act claims

1. The Courier Fee

The $ 14.00 courier fee was charged to the Cowens by Equity Title to cover the cost of sending payoff checks after the closing to each of the Cowens' two prior mortgagees via Airborne Express, an overnight courier service. (The actual cost to Equity Title was $ 7.50 a check, or $ 15.00. Equity Title miscalculated how much overnight delivery of the checks would cost, but made up the difference itself.) The broad question is whether this courier fee should have been categorized as a finance charge by Bank United in its TILA Disclosure instead of being included in the amount financed.

Under the TILA and Regulation Z, finance charges are classified as those charges "payable directly or indirectly by the borrower," and "imposed directly or indirectly by the creditor as an incident to [or a condition of] the extension of credit." *15 U.S.C. § 1605(a)*; 12 C.F.R. § 226.4(a). [*6] In the present case, there is no dispute that the Cowens paid the courier fee. It is also clear that Bank United did not directly require them to pay the fee before it would extend credit. Consequently, the real issue is whether sending the payoff checks by overnight courier was an indirect or implicit requisite of the loan.

Plaintiffs contend that under *Rodash v. AIB Mortgage Co., 16 F.3d 1142 (11th Cir. 1994),* fees for the transportation of loan documents are considered finance charges as a matter of law. In Rodash, the Eleventh Circuit held that a $ 22.00 Federal Express charge imposed by the creditor on the borrower to pay for the cost of sending the payoff check to the prior lienholder, and also to send the original loan documents to the creditor's assignee, was "undoubtably" a finance charge within the meaning of the TILA. *Id. at 1147.*

Bank United, however, argues that Rodash is distinguishable because in Rodash it was the creditor itself who charged the fee to the borrower, and it was the creditor who had the option of selecting how the payoff check and loan documents were sent. In the present case, by [*7] contrast, Bank United maintains that it was Equity Title who decided to send the payoff checks by overnight courier, and who collected the $ 14.00 fee. This distinction is critical because the official commentary to Regulation Z (which is binding unless demonstrably irrational, *Johnson v. Fleet Fin., Inc., 4 F.3d 946, 949 (11th Cir. 1993)),* provides that "charges imposed on the consumer by someone other than the creditor for services not required by the creditor are not finance charges, as long as the creditor does not retain those charges." Official Staff Interpretation of Regulation Z, § 226.4(a)(3), reprinted in 12 C.F.R. § 226, supp. 1, at 299 (1994). On the other hand, charges imposed on the

consumer by a third party to pay for services required by the creditor are considered finance charges. *Id.*

The Cowens admit that Bank United did not receive or retain any part of the courier fee. Therefore, the ultimate question can be distilled to: Did Bank United require Equity Title to use an overnight courier service to send the payoff checks to the prior mortgagees? Obviously, Bank United maintains that it did not. In support of this contention [*8] it offers the affidavit of Marc Brovender ("Brovender"), Bank United's Eastern Regional Wholesale Manager. Brovender states that "Bank United does not require that payoff checks to prior mortgagees be sent by overnight courier service. The determination of which method to use...is made solely by the title company in conjunction with the borrowers."

Abilheira's affidavit and deposition testimony are consistent with this statement. According to him, the courier charge in the instant case (listed on line 1304 of the HUD-1 as "courier fee/ETC 2 $ 7.00"), was imposed solely by Equity Title and represented the amount Equity Title anticipated it would cost to send the payoff checks via an overnight courier service to the two prior lienholders who held the first and second mortgages on the Cowens' property. Abilheira also swears that he explained the charge to the Cowens at the closing, and that they did not object to the use of the courier service because the $ 14.00 fee was more than offset by the $ 17.19 in per diem interest charges that would have continued to accrue on the two prior mortgages until they were completely paid off. In addition, Lee Kenyon ("Kenyon"), the Sales Manager of [*9] Regional who worked on the Cowen's loan, states that she also discussed the courier fee with Jean Cowen a few days before the closing, and that Jean Cowen approved it.

The Cowens acknowledge that the sooner the prior mortgagees received the payoff checks the less interest that would accrue, and despite plaintiffs' apparent argument to the contrary, this simple fact remains true even if the payoff checks included a few extra days per diem interest payments to cover the time it would take the mortgagees to process the payoffs once the checks were received. Plaintiffs also admit that Equity Title sent the payoff check via Airborne Express as soon as the three-day rescission period under Regulation Z had expired, *see* 12 C.F.R. § 226.15, and that the actual cost to Equity Title for the delivery was $ 15.00, or one dollar more than they were actually charged.

The Cowens deny, however, (in un-sworn and un-notarized "declarations"), that Abilheira or Kenyon ever explained the courier fee to them or that they expressly approved it. Plaintiffs make much of this point, and argue that this alone creates a genuine issue of material fact precluding summary judgment. Whether the Cowens

understood [*10] what the courier fee was for, though, is irrelevant to defendant's summary judgment motion for two reasons.

First, the Cowens were made aware of the existence of the courier fee, and agreed to pay it when they signed off on the HUD-1, which clearly listed the charge on line 1304. One who signs an instrument is presumed to understand and agree to its contents. *See, e.g., Hughes v. United Van Lines Inc., 829 F.2d 1407, 1417 (7th Cir. 1987), cert. denied, 485 U.S. 913, 108 S. Ct. 1068, 99 L. Ed. 2d 248 (1988); RS & P/WC Fields Ltd. Partnership v. B OSP Invs., 8 29 F . Supp. 928, 969 (N.D. Ill. 1 993).* Second, the real issue is whether Bank United required the Cowens to use an overnight courier to deliver the payoff checks, not whether the Cowens were aware of Equity Title's proffered explanation for why the service was used *(i.e.,* to save the Cowens per diem interest charges).

Plaintiffs next argue that even if Bank United did not expressly mandate the use of an overnight courier service, such a requirement was constructively imposed by Bank United's closing [*11] instructions. Putting aside the numerous unsubstantiated conclusions contained in plaintiff's Rule 12(n) statement of facts, however, the only relevant instructions whose existence is actually supported by the record are: 1 ) E quity T itle had to insure that Bank United obtained a valid first lien on the Cowens' property, which required Equity Title to payoff the current first and second mortgages; 2) the "closing package" (a collection of various loan documents) had to be sent to Bank United within 24 hours of the closing; and 3) the closing package had to contain a "payoff/discharge of all liens." n2

> n2 James O'Donnell, Equity Title's president, testified that the "payoff" and "discharge" of the prior liens were two different things. The "payoff" referred to "getting the check to the prior lienholder," whereas the "discharge" referred to actually noting that the prior lien was removed at the recorders' office, which would not take place until months after the payoff.

The Cowens argue that the practical effect of these [*12] instructions was to force Equity Title to use an overnight courier so that it could correctly calculate the proper payoff amounts and confirm to Bank United in the closing package that the prior liens were satisfied and that Bank United had a valid first position on the Cowens' home. A thorough analysis of the closing instructions, however, in conjunction with the deposition testimony and affidavits before the court, leads to the

inescapable conclusion that none of Bank United's closing instructions required Equity Title to use an overnight courier, even though Equity Title might have regularly have chosen to do so on its own.

With regard to the calculation of the payoff figures, the record indicates that Equity Title determined these amounts based on figures provided by the prior lienholders, and then added a few days per diem interest in order to cover the period from the time it obtained the initial figures until the date it calculated the check would arrive. Any extra money left over would then be returned to the borrower by the lienholder. Using an overnight courier obviously resulted in the least amount of per diem interest charges, but Abilheira and James O'Donnell ("O'Donnell"), [*13] Equity Title's President, testified that Equity Title could just have easily sent the payoff checks by certified mail as long as several extra days or weeks of per diem interest charges were added in order to compensate for the additional time it would take for the checks to arrive by mail.

Likewise, O'Donnell testified that Equity Title could still confirm to Bank United in the closing package that it had a first lien position even if an overnight courier service was not used to send the payoff checks. O'Donnell explained that the closing instruction requiring that "payoff/discharge all liens" be included in the closing package was satisfied by simply including a HUD-1 signed by the borrowers that indicated that payoffs had been made to the prior lienholders.

According to O'Donnell's uncontroverted testimony and affidavit, Equity Title was not required to provide further proof to Bank United that the payoff checks had actually been sent because at that point Bank United was protected by Equity Title's title policy commitment which insured Bank United of its lien priority from the date of the closing. Indeed, because Equity Title sent the closing package to Bank United on the same [*14] day it sent the payoff checks to the prior lienholders, it would have been impossible for it to prove in the closing package that the checks had arrived, regardless of whether they were sent by overnight courier or regular mail.

After the parties finished their regular briefing on defendant's motion for summary judgment, plaintiffs' filed a "Motion For Leave to Respond to New Matter Raised in Defendant's Reply Brief and to Cite Recent Authority." This motion, *inter alia,* directs the court's attention to the recent decision by Judge Conlon in Hickey v. Great Western Mortgage Corp., No. 94 C 3638 (N.D. Ill. Jan. 3, 1995). Like the instant case, Hickey involved the question of whether an overnight courier fee charged by the third party who handled the closing

should have been classified as a finance charge by the creditor (Great Western) in its TILA Disclosure.

As did this court, Judge Conlon initially decided that, under the TILA and Regulation Z, the question of whether a fee imposed by a third party should be classified as a finance charge ultimately hinges on whether the creditor required the services for which the third party imposed the fee.

> If the creditor requires [*15] a certain service to be performed and knows that a third party will perform the service and impose a separate charge on the consumer for performing the required service, the creditor has a duty to disclose this known cost to the consumer; the creditor indirectly 'imposes' the cost by requiring the service. In contrast, however, is a situation where a third party charges a consumer for performing services that are neither needed nor required by the creditor. In this situation, the cost is not imposed by the creditor in any form...

*Id.,* slip. op. at 11.

Judge Conlon then concluded that Great Western was not entitled to summary judgment because the record was silent as to what the $ 42.00 Federal Express fee in that case actually covered. *Id.,* slip op. at 14. The court noted that there was evidence that Federal Express typically charges only $ 9.00-$ 15.50 to send a letter, which suggested that the fee might have been inflated. In addition, the court also found that there was nothing in the record that conclusively determined whether the fee was intended to cover the cost of sending the payoff check to the prior lienholder, which the court found was not a required service [*16] according to the closing instructions, or whether it was to pay for the cost of sending the loan documents back to Great Western within 24 hours, which was required under the closing instructions. *Id.,* slip op. at 13-14.

This case, by contrast, it is undisputed that Equity Title used the $ 14.00 courier fee only to pay for sending the payoff checks, not to cover the cost of returning the closing package to Bank United. It is also undisputed that this fee was more than $ 14.00 to send the payoff checks. Accordingly, rather than compelling a finding in favor of the plaintiffs, Hickey strongly supports defendant's position. Thus, as a matter of law, the court finds that Bank United's closing instructions did not constructively

require Equity Title to use an overnight courier to send the payoff checks to the prior lienholders.

Plaintiffs also argue that there are issues of fact concerning whether Bank United authorized Equity Title to impose the $ 14.00 courier fee on the Cowens, or whether it ratified the imposition of this charge after the fact. Whether Bank United allowed Equity Title to pass the courier fee on to the [*17] Cowens, however, is irrelevant to the issue of whether the courier fee should have been disclosed as a finance charge, which depends only on whether Bank United required Equity Title to send the payoff checks by overnight courier. Official Staff Interpretation of Regulation Z, *supra* at 299 (1994). Consequently, the court rejects this argument as well.

Finally, because the court finds that the courier fee is not a finance charge under the TILA on the grounds that Bank United did not directly or indirectly impose the fee on the Cowens, it need not address defendant's alternative arguments that the courier fee was not a finance charge because it falls under the exception for fees for title examination and other similar purposes contained in 12 C.F.R. § 226.4(c)(7), or because the courier fee was a charge of a type payable in a comparable cash transaction. *See 15 U.S.C. § 1605*(a); 12 C.F.R. § 226.4(a).

2. The Assignment Fee

The court next turns to Bank United's motion for summary judgment as to the $ 10.00 assignment fee. Bank United asserts that, contrary to plaintiffs' allegations, the assignment fee was actually included in the finance [*18] charge. In support of this contention, Bank United provides a sworn affidavit to that effect by Susan Bradbury ("Bradbury"), the Senior Closing Coordinator who handled the Cowen's loan, and the following logical argument:

> The Cowens paid $ 2,268.06 in prepaid finance charges, which can be determined by subtracting the "amount financed" ($ 62,431.94) from the principal loan amount ($ 64,000). 12 C.F.R. § 226.18(b). Ignoring the assignment fee, the other prepaid finance charges reflected on the HUD-1 are the following: $ 1,294 origination fee, $ 68 tax service fee, $ 385 loan processing fee, $ 325 underwriting fee, and interim interest to Bank United of $ 186.06. The sum of these other prepaid finance charges is $ 2,258.06, which is $ 10 less than the total prepaid charges calculated above. Since the assignment fee is the only $ 10 charge reflected on the

HUD-1, the assignment fee was included in the finance charge.

Memorandum in Support of Defendant Bank United's Motion for Summary Judgment, p. 6 n.1.

Plaintiffs do not dispute the reasoning of this argument. Instead, the Cowens contend that there is still a disputed issue of fact as to whether the $ 10.00 assignment fee was [*19] included as a finance charge because of conflicting statements made by Jonathan Heffron ("Heffron"), Bank United's General Counsel. Early in the case, Heffron told plaintiffs' counsel that although $ 10.00 of the $ 14.00 courier fee had been included in the finance charge, the finance charge did not include any of the $ 10.00 assignment fee. Later, in a letter dated September 14, 1994, Heffron corrected himself, and stated that, in fact, the entire assignment fee was included in the finance charge, but the courier fee was not.

According to Bradbury's affidavit, Heffron's confusion resulted from the fact that when she entered the information regarding the Cowen transaction into Bank United's computer system she placed the $ 10.00 assignment fee in the "messenger fee" field because the computer program did not have a separate field for assignment fees. Bradbury also stated: "The computer program automatically factors amounts entered into [the messenger fee] field into the TILA Disclosure finance charge calculation. The messenger fee field was not used for any other fee because [Bank] United did not impose messenger fees on the Cowens."

The court, however, need not decide whether Heffron's [*20] statements are sufficient to create a genuine issue of fact, *compare Cameron v. Frances Slocum Bank & Trust Co., 824 F.2d 570, 574-75 (7th Cir. 1987)* (summary judgment inappropriate when witness made conflicting statements) *with Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)* (party opposing motion for summary judgment must raise more than some "metaphysical doubt;" instead, a rational trier of fact must be able to find in its favor), because, in any event, there is no genuine issue of material fact.

Only factual disputes that could affect the outcome of the suit are considered "material," and can prevent the entry of summary judgment. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); Scholes v. Stone, McGuire & Benjamin, 821 F. Supp. 533, 535 (N.D. Ill. 1993)*. In the instant case, even if the inference most favorable to the Cowens is drawn *(i.e.,* accepting Heffron's [*21] initial statement

that $ 10.00 of the courier fee was included as a finance charge, but none of the assignment fee was, and rejecting his later explanation), there is still no TILA violation because even if the assignment fee was improperly excluded from the finance charge, the resulting $ 10.00 understatement would be considered a de minimus error under Regulation Z, and thus not amount to a violation of the TILA. 12 C.F.R. § 226.18(d) n.41 ("The finance charge shall be considered accurate if it is not more than...$ 10 above or below the exact finance charge in a transaction involving an amount financed of more that [sic] $ 1000.").

Furthermore, because, as explained above, the $ 14.00 courier fee is not properly classified as a finance charge anyway, under plaintiff's version of the facts Bank United overstated the amount of finance charges by $ 10.00 with regard to the courier fee, which would cancel out any understatement of the finance charges with regard to the $ 10.00 assignment fee. Therefore, under either scenario, Bank United did not violate the TILA with respect to the Cowens' assignment fee.

B. State Law Unfair and Deceptive Trade Practices Statutes

Having disposed of [*22] plaintiffs' TILA claim, the court now turns to Count II of plaintiffs' amended complaint. Plaintiffs allege violations of "one or more of" over fifty state statutes, but because this case has not been certified as a class action, this claim is obviously over-inclusive. In its motion for summary judgment, defendant argues that because plaintiffs and their property are in Massachusetts, and because Bank United is a Texas corporation headquartered in Texas, only Massachusetts or Texas law can apply. Because plaintiffs chose to ignore Bank United's arguments as to Counts II and III in their response, the court will accept its position for purposes of this motion.

To establish a violation under the Massachusetts Consumer Protection Act (the "Massachusetts Act"), Mass. Gen. L. ch. 93A (1984), a claimant must show that the defendant's actions fell "'within at least the penumbra of some common law, statutory, or other established concept of unfairness,' or were 'immoral, unethical, oppressive or unscrupulous,' and resulted in 'substantial injury....'" *Quaker State Oil Ref. Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir. 1989) (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975)).* [*23] Because the court finds that there was no violation of the TILA as a matter of law, and because Bank United's conduct can hardly be described as "immoral" or "oppressive," there is no basis to conclude that the Massachusetts Act was violated. Furthermore, even if defendant did violate the TILA, plaintiffs have not shown that they were "substantially

injured" as the result of Bank United's conduct. Therefore, summary judgment is warranted as to plaintiffs' claims under the Massachusetts Act regardless of the outcome on Count I.

Defendants are likewise entitled to summary judgment as to plaintiffs' claims under the Texas Deceptive Trade Practices and Consumer Protection Act (the "Texas Act"), Tex. Bus. & Com. Code Ann. § 17.41 *et. seq.* (1987). Under the relevant provision of the Texas Act, failure to disclose information concerning goods or services is actionable "if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed." Tex. Bus. & Co. Code Ann. § 17.46(b)(23).

In the present case, the existence of the courier fee and the assignment fee were clearly disclosed [*24] to the Cowens. The only dispute is whether these fees should have been classified as finance fees rather than included in the amount financed. Plaintiffs do not allege that they would not have entered into the loan transaction had the fees been characterized differently. Therefore, there can be no violation of the Texas Act, and summary judgment in favor of Bank United is granted as to Count II of plaintiffs' amended complaint as well.

C. Restitution Claim

The court also grants summary judgment in favor of Bank United as to plaintiffs' restitution claim. Count III of the amended complaint alleges that: "Bank United obtained charges which it should not be permitted to retain in equity and good conscience, because these charges were not disclosed as finance charges on the TILA disclosure statements that were provided." The court's finding that Bank United acted properly under the TILA, however, obviously precludes this claim.

Moreover, even were there a TILA violation, plaintiffs would still not be entitled to restitution. Restitution is only available when a defendant has wrongfully and unjustly obtained a benefit from the plaintiff. 1 George F. Palmer, The Law of Restitution [*25] § 1.7 (1st ed. 1978). In the instant case, as mentioned above, Bank United did not even receive the courier fee, and, regardless of how it should have been classified, the assignment fee was disclosed to the Cowens in the HUD-1, and only amounted to $ 10.00 of a transaction involving more than $ 60,000. The court, therefore, finds that any possible misconduct by defendant is of insufficient magnitude to require an equitable remedy. Thus, as with Count II, Bank United is entitled to summary judgment as to Count III regardless of the outcome of Count I.

II. Plaintiffs' Motion for Leave to Amend

1995 U.S. Dist. LEXIS 1087, *

The court will next address plaintiffs' motion for leave to file a second amended complaint. Whether to grant or deny leave to amend a complaint is left to a district court's discretion. *E.g., Campbell v. Ingersoll Milling Mach. Co., 893 F.2d 925, 927 (7th Cir. 1990), cert. denied, 498 U.S. 844, 111 S. Ct. 127, 112 L. Ed. 2d 95 (1990).* Under Fed.R.Civ.P. 15(a), "leave [to amend pleadings] shall be freely given when justice so requires," but amendments are inappropriate where there is undue delay, a [*26] dilatory motive on the part of the movant, undue prejudice to the opposing party, or if the proposed amendment would be futile. *Perrian v. O'Grady, 958 F.2d 192, 194 (7th Cir. 1992).*

Furthermore, where a plaintiff seeks to amend his complaint after the defendant has already moved for summary judgment, the plaintiff must first show that the proposed amendment has substantial merit and is supported by substantial and convincing evidence. *Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir. 1994); Torres-Matos v. St. Lawrence Garment Co., Inc., 901 F.2d 1144, 1146 (1st Cir. 1990) (citing Verhein v. So. Bend Lathe, Inc., 598 F.2d 1061, 1063 (7th Cir. 1979)).* n3 The reason for applying this heightened standard in cases involving a pending motion for summary judgment is because a critical factor in deciding whether to allow a party to amend his complaint is the degree of prejudice to the defendant, and a defendant would be seriously prejudiced if the plaintiff had the unfettered right to alter his cause of action every time it appeared that the defendant might [*27] be able to defeat it. *See Carey, 500 F. Supp. at 582.*

n3 Although the Seventh Circuit has not squarely addressed the issue, several other Courts of Appeal are in accord with the First Circuit's rule, and the court finds its reasoning persuasive. *See, e.g., Little v. Liquid Air Corp., 952 F.2d 841, 846 n.2 (5th Cir. 1992), aff'd in relevant part en banc 37 F.3d 1069, 1073 n.8 (5th Cir. 1994)* ("This Court has previously emphasized that the fact that a defendant has filed a motion for summary judgment is significant in the determination [of] whether a plaintiff's subsequent motion to amend is timely."); *Ansam Assocs., Inc. v. Cola Petroleum, Ltd., 760 F.2d 442, 446 (2d Cir. 1985)* ("Moreover, permitting the proposed amendment would have been especially prejudicial given the fact that... [the defendant] had already filed a motion for summary judgment."); *Carey v. Beans, 500 F. Supp. 580, 582 (E.D. Penn. 1980), aff'd, 659 F.2d 1085 (3d Cir. 1981)* (containing language very similar to RTC v. Gold and Tamos-Matos).

[*28]

Of course, this is not to say that a plaintiff may never amend his complaint once a defendant has moved for summary judgment. The standard discussed above only requires that before leave to amend is granted, the plaintiff must first provide an adequate explanation for why his new claims were not alleged earlier, and he must also demonstrate that there is a significant and persuasive factual basis for his proposed amendments. This will help insure that plaintiffs make a diligent and thorough initial investigation of the facts of a case before filing suit, and prevent plaintiffs from adding new claims of dubious merit simply in an attempt to forestall an inevitable ultimate defeat.

In the instant case, the Cowens' proposed second amended complaint challenges two other fees in addition to the assignment and courier fees contested in their first amended complaint. Plaintiffs acknowledge that these fees were disclosed in the HUD-1, and thus admit they were aware of the fees since before the suit was initiated. Plaintiffs claim, however, that it was not until they deposed Abilheira and O'Donnell that they discovered information which led them to believe that there were TILA violations [*29] in connection with the title rundown and record fee and the settlement or closing fee.

With respect to the title rundown and record fee, Bank United states that this charge was imposed to pay for the services of an Equity Title employee who searched the title record from the time the title search was initially performed until the present, and then recorded the new mortgage. Defendant maintains that this fee was charged by Equity Title, not itself, and, in any event, that such a fee is not a finance charge under Regulation Z, which exempts "fees for title examination, abstract of title, title insurance, property survey, and similar purposes." 12 C.F.R. § 226.4(c)(7)(i).

The Cowens, on the other hand, argue that Equity Title acted as Bank United's agent, and that the Equity Title employee was merely a messenger who simply transported the mortgage to the recorder's office for recording. They also contend that the section 226.4(c)(7)(i) exemption should not apply because the Equity Title employee is not a professional title examiner, and because they were already charged a separate $ 175.00 "abstract or title search fee."

Plaintiffs, however, do not support these assertions with any legal [*30] or factual authority other than a two-sentence statement by Abilheira, who, when asked at his deposition what the title rundown and record fee was for, replied: "After the closing is completed, of course the document needs to be recorded. This is for going -- whoever's recording, it goes back to the registry or the city or town, if it's in Rhode Island, checks or runs the

record from the time the title search was completed to the present and then record the actual mortgage document."

This is hardly "substantial and convincing evidence" that the title rundown and record fee should have been categorized as a finance charge. Abilheira clearly stated that the Equity Title employee checked the title before recording the mortgage, and there is nothing in the language of section 226.4(c)(7)(i) that requires title searches to be conducted by a professional title examiner before they may be excluded from the finance charge. In addition, this charge is not duplicative of the abstract or title search fee, because Abilheira's testimony indicates that the title rundown only covered the period after the original search was performed until the present.

The Cowens have, likewise, not presented substantial [*31] and convincing evidence that "the $ 395 settlement or closing fee included duplicative charges, such as charges for the delivery of documents, which are required to be disclosed as finance charges under TILA," as alleged in their proposed second amended complaint. The only evidence in the record before the court regarding the settlement or closing fee is deposition testimony by Abilheira and O'Donnell that this charge was for the time Abilheira spent at the closing, as well as related pre-closing and post-closing activities, such as obtaining payoff and tax information and insuring that the necessary disbursements were made and mortgage discharges performed.

Nothing in their testimony indicates that these services included the delivery of documents already charged to the plaintiffs, or were otherwise duplicative. Indeed, these services appear to be of the type described in the official comment to section 226.4(c)(7) of Regulation Z, which states, in part:

A charge for a lawyer's attendance at the closing or a charge for conducting the closing (for example, by a title company) is excluded from the finance charge if the charge is primarily for services related to

the items listed [*32] in section 226.4(c)(7) (for example, reviewing or completing documents), even if other incidental services, such as explaining various documents or disbursing funds for the parties, are performed.

Official Staff Interpretation of Regulation Z, *supra,* at 302.

In sum, plaintiffs have not proved that their proposed new claims have substantial merit and are supported by substantial and convincing evidence. To the contrary, the court finds that plaintiffs have not made any serious showing that the record and rundown fee should have been categorized as finance charges, or that the settlement or closing fee contained duplicative charges. Therefore, plaintiffs' motion for leave to amend their complaint is denied.

CONCLUSION

In conclusion, the court finds that Bank United did not violate the TILA with respect to either the $ 14.00 courier fee or the $ 10.00 assignment fee as a matter of law. The court also finds that the Cowens have not shown that their proposed amendments to the complaint have substantial merit and are supported by substantial and convincing evidence. Therefore, for the reasons stated herein, defendant's motion for summary judgment is granted in its entirety, and [*33] plaintiffs' motion for leave to amend is denied. Plaintiffs' motion for class certification, and defendant's motion to schedule a preliminary pretrial conference and motion to stay further proceedings relating to class certification, are also denied as moot.

IT IS SO ORDERED.

Harry D. Leinenweber, Judge

United States District Court

DATED: 1/25/95